James E. Cecchi
CARELLA BYRNE CECCHI
BRODY & AGNELLO, P.C.
5 Becker Farms Rd.
Roseland NJ, 07068
973-994-1700
jcecchi@carellabyrne.com

*Counsel for Plaintiff and the Proposed Class*

[*Additional counsel in signature block*]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **EDWIN TEJEDA, individually, on behalf of the M&T BANK CORPORATION RETIREMENT SAVINGS PLAN, and on behalf of all similarly situated participants and beneficiaries of the M&T Bank Corporation Retirement Savings Plan,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**MANUFACTURERS AND TRADERS TRUST COMPANY, M&T BANK CORPORATION, and the M&T EMPLOYEE BENEFIT PLANS COMMITTEE,**<br><br>**Defendants.** | **CASE NO.: ___________________** |

## CLASS ACTION COMPLAINT

Edwin Tejeda ("Plaintiff"), individually and as representative of a Class of Participants and Beneficiaries of the M&T Bank Corporation Retirement Savings Plan (the "Plan"), through counsel, brings this Class Action Complaint and alleges and asserts to the best of his knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the following:

## INTRODUCTION

1. The Employee Retirement Income Security Act of 1974 ("ERISA") requires 401(k) plan fiduciaries to act "solely in the interest of the participants and beneficiaries," with "the care, skill, prudence, and diligence" of a prudent person. 29 U.S.C. § 1104(a)(1). ERISA fiduciary duties are "the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982). Those duties include "a continuing duty to monitor trust investments and remove imprudent ones." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015).

2. Defendants—Manufacturers and Traders Trust Company ("Trust Company" or the "Sponsor"), the Plan sponsor, the parent corporation M&T Bank Corporation ("M&T Bank"), and the M&T Employee Benefit Plans Committee ("Committee") that administers the Plan—breached that duty by keeping the T. Rowe Price Growth Stock Fund (the "TRP Growth Stock Fund") on the Plan's investment menu for years after the information available to them showed that it should be replaced. At the end of 2025, Plan participants had more than $446 million of their retirement savings in the TRP Growth Stock Fund alone.

3. The measuring stick in this case is not one Plaintiff chose. T. Rowe Price measured the TRP Growth Stock Fund against the Russell 1000 Growth Index and has called that index "the most appropriate benchmark for our fund."[1] By that measure, the fund trailed its benchmark on a three-year basis in every quarter from the third quarter of 2019 through the end of 2025, and by the Plan's own figures it trailed the index by nearly six percentage points a year over the five years, and by about four percentage points a year over the ten years, ended December 31, 2025.

[1] T. Rowe Price Growth Stock Fund, Inc., Annual Report for the Year Ended December 31, 2019 (Form N-CSR, filed Feb. 19, 2020), https://www.sec.gov/Archives/edgar/data/80257/000120677420000516/argsf_ncsr.htm (last visited Oct. 8, 2026).

4. Before October 9, 2020, the start of the period at issue here (the "Class Period," which runs through the date of judgment), T. Rowe Price told the fund's shareholders that the fund had "lagged" the Russell 1000 Growth Index and its peer group, and Morningstar ranked its 2019 return in the 63rd percentile of its category. The warning signs then multiplied. By the end of 2021, the fund had trailed its benchmark over three years in ten consecutive quarters. In 2022, the fund lost 40 percent, 11 percentage points more than its benchmark. Investors withdrew, net, about $20.6 billion from the fund in the two years that followed, at a faster rate than from any of the comparator funds described below. And in December 2024, T. Rowe Price announced that the portfolio manager who had run the fund for more than a decade would step down.

5. A prudent fiduciary with the same information would have placed the TRP Growth Stock Fund on watch before the Class Period and replaced it by the middle of 2020—and, if not then, at each of the later points at which the evidence against the fund mounted, as alleged below. Defendants did neither.

6. Defendants' failure to monitor and remove this fund cost Plan participants tens of millions of dollars of retirement savings. Measured against the comparators described below, the Plan's losses from the TRP Growth Stock Fund from December 31, 2019, through December 31, 2025, were hundreds of millions of dollars[2].

7. Plaintiff therefore brings this ERISA action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (a)(3) and Rule 23 of the Federal Rules of Civil Procedure, as a representative of a class of participants and beneficiaries of the Plan, against Defendants Trust Company, M&T Bank, and the Committee (collectively "Defendants"), for breaching their fiduciary duties in violation of ERISA with regard to the Plan.

[2] This estimate is based on the hundreds of millions in assets held in this investment and the continuous percentage losses against the comparators.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq*.

9. This Court has personal jurisdiction over Defendants because they are headquartered in this District, reside in this District, transact business in this District, have significant contacts with this District, and because ERISA provides for nationwide service of process.

10. Venue is appropriate in this District within the meaning of 29 U.S.C. § 1132(e)(2) because some or all of the violations of ERISA occurred in this District, Plaintiff was harmed in this District, and Defendants reside and may be found in this District.

## PARTIES

11. Plaintiff is a resident of the State of Texas, residing at 17626 Desmond Street, Atascocita, Texas 77346, and was a resident of the State of New Jersey during parts of the Class Period. Plaintiff is a former participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7), and was a participant during the Class Period. Plaintiff sustained the harm alleged herein while he was a resident of, and was employed by Defendant M&T Bank in, the State of New Jersey.

12. Plaintiff worked at M&T Bank during the Class Period.

13. During the Class Period, Plaintiff invested in the TRP Growth Stock Fund.

14. Plaintiff has Article III standing to bring this action on behalf of the Plan because Plaintiff suffered actual injuries through the imprudent decisions made by Defendants, including the decision to include, and not to remove, the TRP Growth Stock Fund from the Plan. Those injuries are fairly traceable to Defendants' unlawful conduct and breach of their fiduciary duties

under ERISA, and those harms are likely to be redressed by a favorable judgment providing appropriate equitable relief to the Plaintiff and to the Class.

15. Having established Article III standing, Plaintiff may seek recovery under 29 U.S.C. § 1132(a)(2) on behalf of the Plan and for relief that sweeps beyond his own injuries.

16. Plaintiff, like all participants in the Plan, lacked knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties until shortly before this suit was filed. For instance, among other factors, Plaintiff and the other participants did not have access to comparisons of the Plan's investment options with the comparator funds identified below. The records of Defendants' monitoring process, including the minutes of the committee that administers the Plan, any investment policy statement, and any reports of investment consultants to that committee, are not distributed to participants and are in Defendants' possession. Plaintiff therefore pleads that process from the circumstances alleged below, including the comparison to its benchmark and the contemporaneous warning signs concerning the fund, which together support a plausible inference that the process was imprudent.

17. Having never managed a large 401(k) Plan, Plaintiff, and all participants in the Plan, lacked actual knowledge of the Defendants' obligation to conduct a prudent and loyal analysis of investment options within the Plan, and to regularly review those investment options to ensure that they are performing at an acceptable level.

18. M&T Bank is a banking corporation with its principal office located at One M&T Plaza, General Counsel, Floor 8, Buffalo, New York 14203.

19. M&T Bank acted through its officers and Board of Directors to perform Plan-related fiduciary functions in the course and scope of business. M&T Bank, through its Chief Executive Officer, appointed other Plan fiduciaries on the Committee and accordingly had a

fiduciary duty to monitor and supervise those appointees. For these reasons, M&T Bank and its Board are fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A).

20. The Trust Company is, upon information and belief, an affiliate or subsidiary of M&T Bank. The Trust Company is headquartered in Buffalo, New York, sharing an address with its corporate parent, M&T Bank. The Trust Company is the main banking subsidiary of M&T Bank, and as such, is a banking corporation incorporated under the laws of New York.with its principal office located at One M&T Plaza, Legal Counsel, Buffalo, New York 14203. The Trust Company is designated as the sponsor of the Plan in Defendants 5500 filings pertaining to this Plan.

21. The Plan is administered by the Committee. As the Plan Administrator, the Committee is a fiduciary with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). The Committee has authority and responsibility for the control, management, and administration of the Plan in accord with 29 U.S.C. § 1102(a), with all powers necessary to properly carry out such responsibilities.

22. Plaintiff is currently unaware of the identities of the individual members of the Committee.

23. Under 29 U.S.C. § 1109(a), plan fiduciaries are "personally liable to make good to such plan any losses to the plan resulting from each such breach [of fiduciary duty]."

## FACTUAL ALLEGATIONS

24. The TRP Growth Stock Fund has been an investment option in the Plan since at least 2016.

25. The TRP Growth Stock Fund offered in the Plan is the T. Rowe Price Growth Stock Fund, a mutual fund that trades under the ticker symbol PRGFX.[3]

26. As of December 31, 2025, Plan participants had invested over $446 million of their retirement savings in the TRP Growth Stock Fund.

27. As described in detail below, the Defendants' failure to remove this unsuitable and underperforming investment from the Plan has caused the Plan Participants to suffer losses of hundreds of millions of dollars because the plan carried balances of $297 million to $446 million in this investment.[4]

**A. Defendants' Fiduciary Duties Under ERISA**

28. ERISA imposes strict fiduciary duties upon the Defendants as fiduciaries of the Plan, including the duty of prudence. These duties apply to all fiduciary acts, including the Defendants' selection and retention of investment options for the Plan.

29. ERISA's duty of prudence requires fiduciaries to discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B).

30. As part of their fiduciary duty, the Defendants "ha[ve] a continuing duty to monitor [Plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015); *Hughes v. Nw. Univ.*, 63 F.4th 615, 626 (7th Cir. 2023) ("[T]he duty of prudence requires a plan fiduciary to systematically review its funds both at the initial inclusion of a particular fund in the plan and at regular intervals to determine whether each is a prudent

---

[3] Later, Defendants switched to the trust vehicle of this same investment.
[4] Without cash flow data, precise damages calculations are not possible and will be supplemented later in litigation when all necessary data is available.

investment."); *accord Morrissey v. Curran*, 567 F.2d 546, 549 n.9 (2d Cir. 1977) (noting that a "trustee's obligation to dispose of improper investments within a reasonable time is well established at common law" and applying this rule in the ERISA context).

31. "A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Tibble*, 575 U.S. at 530. If an investment is imprudent, Defendants "must dispose of it within a reasonable time." *Id.* (quoting A. Hess, G. Bogert & G. Bogert, *Law of Trusts and Trustees* § 685, at 156-57 (3d ed. 2009)).

32. ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. Under 29 U.S.C. § 1105(a), a fiduciary is liable for another fiduciary's breach if it knowingly participates in or conceals the breach, enables the breach by failing to meet its own duties, or knows of the breach and fails to make reasonable efforts to remedy it.

33. Under 29 U.S.C. § 1132(a)(2), a plan participant is authorized to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109.

**B. Overview of Commonly Accepted Investment Theories**

34. Modern Portfolio Theory ("MPT") stands for the proposition that prudent investors create portfolios to maximize the expected return generated by the portfolio for a given level of risk or minimize the level of risk for a given expected return.

35. As the Government Accountability Office stated in its June 2014 Report to the Ranking Member, Committee on Education and the Workforce, House of Representatives, MPT "is a body of academic and empirical work that focuses on choosing a portfolio, not just its individual parts. Central components include: (1) the concept of diversification—the notion that with a well-chosen group of assets participants may be able to limit their losses and reduce fluctuations of investment returns without sacrificing too much potential gain, and (2) the concept of rebalancing—bringing a participant's portfolio back to an appropriate asset allocation mix—

because over time some investments may become misaligned with the participant's investment goals. Rebalancing helps ensure that participant portfolios do not overemphasize one or more asset categories by returning the portfolio to a comfortable level of risk." U.S. Gov't Accountability Off., GAO-14-310, *401(k) Plans: Improvements Can Be Made to Better Protect Participants in Managed Accounts* 16 n.31 (2014), https://www.gao.gov/assets/gao-14-310.pdf.

36. In other words, **it is a basic principle of MPT that the risks associated with an investment must be justified by its potential expected returns in order for that investment to be rational.** This principle applies even before considering the purpose of the investment or the needs of an investor.

37. MPT is used to provide quantitative metrics to evaluate the performance of investment managers and to provide a rational analysis to determine whether certain investment managers are more likely to achieve a higher expected rate of return for a given amount of risk than others, i.e., outperform other investment managers, or outperform an applicable index.

38. In a March 2024 report on target date funds in 401(k) plans, the U.S. Government Accountability Office analyzed fund performance using several risk-adjusted measures, which it defined as follows:[5]

- Alpha: "A measure of the difference between a portfolio's actual returns and its expected performance, given its level of risk as measured by beta. A positive Alpha indicates the portfolio has performed better than its beta would predict. In contrast, a negative Alpha indicates the portfolio has underperformed, given the expectations established by beta."

[5] *See* U.S. Gov't Accountability Off., GAO-24-105364, *401(k) Retirement Plans: Department of Labor Should Update Guidance on Target Date Funds* 59-60 (2024) (listing measures GAO "examined" "[t]o analyze TDF performance"), https://www.gao.gov/assets/gao-24-105364.pdf.

- Sharpe Ratio: "A risk-adjusted returns measure developed by William Sharpe. It is calculated over each [time] period by dividing a fund's annualized excess returns by the standard deviation of a fund's annualized excess returns to determine reward per unit of risk. The Sharpe Ratio can be used to compare two funds directly on how much risk each had to bear to earn excess return over the risk-free rate."
- Sortino Ratio: "Similar to the Sharpe ratio, the Sortino Ratio (developed by Frank Sortino) uses only the downside risk portion of the standard deviation in the denominator."

39. Some additional MPT metrics used to evaluate the performance of investment managers, and the prudence of an investment option include, but are not limited to, the following:

- Information ratio (IR): a metric that helps the investor evaluate whether the manager of the investment is beating a specific benchmark. An IR above 1.0 is evidence of excellent performance with consistent outperformance of the specific benchmark; an IR between 0.5 and 0.99 is evidence of reasonable manager skill; an IR of below 0.5 is evidence of weak performance as compared to the specific benchmark; and a negative value IR is evidence of consistent underperformance relative to the benchmark.
- Batting Average: is a measure of a manager's ability to consistently beat the market. It is calculated by dividing the number of months in which the manager beat or matched the fund's primary benchmark index by the total number of months in the period. For example, a manager who meets or outperforms the market every month in a given period would have a batting average of 1.000. A

manager who beats the market half of the time would have a batting average of .500.

40. Ultimately, maximizing risk-adjusted performance is the primary and most important criteria from an MPT selection and retention perspective, while the actual performance, returns, of an investment is the most important criteria to the plan participant because returns dictate how much money the participant has available for retirement.

41. Accordingly, risk-adjusted performance and returns should always be considered by a fiduciary when evaluating an investment option.

42. When evaluating the risk-adjusted performance and quality of investment managers, the minimum standard of care for prudent plan fiduciaries requires the incorporation of standard metrics from MPT.

43. The Capital Asset Pricing Model[6] ("CAPM") is an investment theory that builds upon the general framework of MPT and is widely used, including to evaluate the performance of managed portfolios.

44. The CAPM provides the following mathematical formula for the principle that the risks associated with an investment must be justified by its potential returns in order for that investment to be rational:

$ERi = Rf + \beta i(Erm - Rf)$, where:

$ERi$ = the expected return of the investment

$Erm$ = the expected return of the market

$Rf$ = the risk-free rate

[6] *See* Eugene F. Fama & Kenneth R. French, *The Capital Asset Pricing Model: Theory and Evidence*, 18 J. Econ. Persp. 25, 25, 29 (2004) (noting that the CAPM "is still widely used in applications, such as estimating the cost of capital for firms and evaluating the performance of managed portfolios").

$\beta i$ = the beta of the investment

$(Erm - Rf)$ = the market risk premium

45. Applied here, the relevant market is the fund's benchmark index: the beta—*βi*—measures the fund's exposure to that index, and the additional risk and cost of an actively managed mutual fund or collective trust can be justified only if its expected return—*ERi*—exceeds the return its exposure to the benchmark alone would produce, that is, only if the fund is expected to generate positive alpha.[7]

46. Accordingly, any suggestion that a comparison of actively managed funds to passively managed investments (as a proxy for the specific market index that the actively managed investment attempts to beat) is somehow inappropriate or an "apples to oranges" comparison ignores the fundamental purpose and design of active mutual funds and is inconsistent with basic investment theory and the prevailing frameworks employed by prudent fiduciaries and advisors to retirement plans.

47. Prudent fiduciaries should—and *must*—compare actively managed funds to passively managed funds or similar indices in order to determine whether a plan is getting the additional return to justify the increased expense and risk of the active investment. This, in addition to other metrics, is exactly what every minimally competent investment professional does to evaluate an actively managed investment and arguments or suggestions to the contrary fall far outside mainstream thought in terms of investment management, basic economics, and minimum standards of fiduciary care and prudence.

48. Indeed, the Department of Labor's participant-disclosure regulation requires the administrator of a participant-directed plan like the Plan to furnish participants, at least annually

---

[7] In this application, the fund's benchmark index takes the place of the broad market portfolio, whose expected return is Erm, in the general CAPM formula, so that the fund is measured against the investment category in which it invests.

and for each designated investment alternative whose return is not fixed, "the name and returns of an appropriate broad-based securities market index over the 1-, 5-, and 10-calendar year periods," in a chart or similar format "designed to facilitate a comparison" among the plan's investment alternatives. 29 C.F.R. § 2550.404a-5(d)(1), (d)(1)(iii), (d)(2)(i) (2025). In adopting that requirement, the Department explained that "appropriate benchmarks may be helpful tools for participants to use in assessing the various investment options available under their plans." Fiduciary Requirements for Disclosure in Participant-Directed Individual Account Plans, 75 Fed. Reg. 64,910, 64,916 (Oct. 20, 2010). Performing such a comparative analysis is not merely intended to determine whether a plan would be better served by a passively managed investment, but rather whether an actively managed fund is providing value sufficient to justify its retention.

49. This is not to suggest that active management is inappropriate for use in a retirement plan lineup. However, it confirms that plan fiduciaries as a preliminary matter must carefully analyze whether an actively managed fund provides value and, if they deem a fund does not provide increased value, they must promptly replace it with another fund that has demonstrated such capabilities or simply replace it with a fund tracking the index the fund is losing to.

50. An objective application of MPT metrics employed solely in the interest of plan participants is the best investment selection methodology currently available and is the approach that is commonly understood by prudent investment experts to be consistent with ERISA's fiduciary duty to provide retirement benefits to defined contribution plan participants (see more detailed discussion below).

## C. The TRP Growth Stock Fund

### 1. Large-Cap Growth Funds

51. Fiduciary duties and basic investment concepts apply to Large-Cap Growth funds as described.

52. Large-cap stocks are typically considered to be the top 70% of US equity market capitalization.[8] Large-Growth stocks are typically projected to grow faster than other large-cap stocks.

53. Large-Growth funds create portfolios primarily composed of large-cap growth stocks.

54. The typical aim of large-cap growth funds is to provide investors with long-term growth of capital through investments in primarily large capitalization stocks.

55. The principal categories of risk for growth stock funds include market risk, issuer risk, and the risk of investing in growth-oriented stocks.

56. Market risk is the chance that stock prices overall will decline. Stock markets tend to move in cycles, with periods of rising prices and periods of falling prices, so each fund is subject to the risk that the market as a whole will fall.

57. Issuer risk is the chance that prices of, and the income generated by, individual securities of companies held by the fund (*e.g.*, UnitedHealth Group) may decline in response to various factors directly related to the issuers of such securities, including reduced demand for an issuer's goods or services, poor management performance, major litigation, investigations, or other controversies related to the issuer.

58. Investing in growth-oriented stocks also carries risk. In general, such stocks (*e.g.*, Tesla) may experience larger price swings and greater potential for loss than other types of stocks, such as those that are considered value-oriented or those that historically have paid continuous dividends (*e.g.*, 3M Company).

---

[8] *See, e.g.*, *Large Growth*, Morningstar, https://www.morningstar.com/investing-terms/large-growth (last visited Oct. 6, 2026).

**2. T. Rowe Price Growth Stock Fund**

59. The TRP Growth Stock Fund's investment objective is long-term growth of capital through investment in stocks.

60. The TRP Growth Stock Fund is an actively managed fund. In other words, it relies on the professional judgment of a portfolio management team to make decisions about the specific investments within the fund.

61. The TRP Growth Stock Fund normally invests at least 80% of its net assets in stocks of companies with growth characteristics. It generally looks for large companies with one or more of these traits: strong cash flow and above-average earnings growth; earnings momentum that holds up in economic downturns; or a profitable niche in the economy and the ability to keep growing even when the economy is slow.

62. The TRP Growth Stock Fund is considered by Morningstar[9] to be in the "Large Growth" Category and Morningstar also considers the TRP Growth Stock Fund's Investment Style to be "Large Growth."

63. As of December 31, 2025, TRP compared the performance of the TRP Growth Stock Fund to the performance of the Russell 1000 Growth Index[10] and the Russell 3000 Index. In its annual shareholder report for the year ended December 31, 2025, T. Rowe Price identified the Russell 1000 Growth Index as the fund's "Strategy Benchmark," an index that "more closely aligns

---

[9] As the U.S. Government Accountability Office has explained, "Morningstar is a financial services firm that provides data on mutual funds, collective investment trusts, and other investments." U.S. Gov't Accountability Off., *supra* note 3, at 2 n.2. Unless otherwise noted, the fund returns, percentile rankings, category and style classifications, holdings, assets, net flows, and portfolio managers' start dates alleged in this Complaint are from Morningstar data. Assets and net flows are those of each fund as a whole, across all of its share classes. *See generally* Morningstar, Inc., https://www.morningstar.com. In Morningstar's percentile rankings of returns, lower is better.

[10] The Russell 1000 Growth Index is maintained by FTSE Russell, the index business of the London Stock Exchange Group. The Russell 1000 Index measures the performance of the 1,000 largest companies in the Russell U.S. equity universe. The Russell 1000 Growth Index measures the performance of the Russell 1000 companies with growth characteristics, and the capitalization of the Russell 1000 is divided between it and the Russell 1000 Value Index.

to the fund's investment strategy," and the Russell 3000 Index as its "Regulatory Benchmark," "a regulatory required index that represents an overall securities market"—the broad-based index that SEC rules require a mutual fund to show alongside its own returns, and which, the SEC has explained, may not be an index defined by characteristics such as "growth" or "small- or mid-cap."[11] In the same report, the fund's returns of 15.65%, 9.36%, and 14.16% for the one, five, and ten years ended December 31, 2025 trailed the Russell 3000 Index's returns of 17.15%, 13.15%, and 14.29%.

64. Accordingly, a potential reward of investing in the TRP Growth Stock Fund is that it will generate positive investment returns that outperform the Russell 1000 Growth Index.

### 3. The TRP Growth Stock Fund Systematically and Substantially Underperformed Its Own Benchmark During the Class Period

65. The methodologies employed by careful and prudent fiduciaries are designed to utilize MPT and CAPM to select a diversified menu of investment options that can be used to create a risk/reward profile that can meet the needs of any hypothetical plan participant. It may be rational and prudent to include riskier investments, but only if that risk carries with it a potential for a higher reward, i.e., an outsized return exceeding the return of a comparable risk-free (or lower-risk) option.

66. Index comparisons, as described above, are also particularly important in the efficient U.S. large cap space. Prudent fiduciaries are concerned with actively managed funds' ability to add value in excess of the benchmark, particularly with the domestic large cap strategies.

---

[11] T. Rowe Price Growth Stock Fund, Inc., Annual Shareholder Report: Growth Stock Fund Investor Class (PRGFX), December 31, 2025 (Form N-CSR) 2 (Feb. 23, 2026), https://www.sec.gov/Archives/edgar/data/80257/000119312526063164/d77166dncsr.htm (last visited Oct. 2, 2026); Tailored Shareholder Reports for Mutual Funds and Exchange-Traded Funds; Fee Information in Investment Company Advertisements, 87 FR 72758-01 (Nov. 25, 2022).

67. To that end, to measure the value added or subtracted by a portfolio manager, prudent fiduciaries and investment professionals scrutinize a fund's alpha, a measure of the difference between a portfolio's actual returns and its expected performance, given its level of risk as measured by beta. This risk is the risk of the relevant market index. A positive alpha indicates that the portfolio has performed better than its beta would predict; a negative alpha indicates the fund has underperformed expectations based on the risk assumed. Said more simply, alpha represents the return on an investment that is not attributable to the movement of the market.

68. Most plans use the Russell 1000 Growth Index as the TRP Growth Stock Fund's benchmark because T. Rowe Price's own published fund fact sheet for the TRP Growth Stock Fund lists the Russell 1000 Growth Index as its appropriate benchmark.

69. This fact also makes the Russell 1000 Growth Index the most appropriate index to use in the context of the calculation and evaluation of the investment performance metrics to determine whether any particular investment option, such as the TRP Growth Stock Fund, is prudent under the circumstances prevailing prior to and throughout the Class Period.

70. Performance data for the TRP Growth Stock Fund from Q3 2019 through Q4 2025 show that it underperformed its benchmark in every quarter under 3-year returns and 3-year alpha, and in all but two quarters under 5-year returns and 5-year alpha. This would have tipped off any prudent fiduciary that this investment is not justifying its active management risk and thus would have removed it in favor of a peer fund that did not violate this basic investment concept or simply retained the benchmark instead. Each quarter's figures were available to Defendants at the end of that quarter from the fund's published returns and those of its benchmark.

71. Even more concerning, as illustrated in the table below, starting in Q3 of 2019, the TRP Growth Stock Fund outperformed its benchmark only four times: in 5-year returns and alpha, for Q1 and Q2 2021 *only*. Thus, starting Q3 of 2019 TRP Growth Stock Fund underperformed *26*

*out of 26 consecutive quarters* under 3-year returns against its index benchmark; *24 out of 26* quarters under 5-year returns against its index benchmark; *26 out of 26 quarters* under 3-year alpha; and *24 out of 26 quarters* under 5-year alpha. A prudent fiduciary reviewing TRP Growth Stock Fund's performance against its benchmark would not have sat idly by as it continued to fail to justify its additional risk against its index benchmark.

| T. Rowe Price Growth Stock Fund (PRGFX) | | | | |
|---|---|---|---|---|
| | Return vs Benchmark | | Alpha | |
| | 3-Year | 5-Year | 3-Year | 5-Year |
| Q3 2019 | (0.58%) | (0.38%) | (0.43%) | (0.57%) |
| Q4 2019 | (0.43%) | (0.39%) | (0.52%) | (0.61%) |
| Q1 2020 | (1.38%) | (0.98%) | (1.37%) | (1.15%) |
| Q2 2020 | (2.57%) | (1.26%) | (2.34%) | (1.44%) |
| Q3 2020 | (2.82%) | (1.67%) | (2.36%) | (1.68%) |
| Q4 2020 | (1.96%) | (1.84%) | (1.55%) | (1.76%) |
| Q1 2021 | (2.26%) | 0.04% | (1.56%) | 0.18% |
| Q2 2021 | (2.08%) | 0.54% | (1.52%) | 0.57% |
| Q3 2021 | (1.21%) | (0.71%) | (0.88%) | (0.38%) |
| Q4 2021 | (5.01%) | (2.07%) | (3.55%) | (1.27%) |
| Q1 2022 | (7.22%) | (4.08%) | (6.00%) | (3.37%) |
| Q2 2022 | (8.35%) | (5.74%) | (7.92%) | (5.33%) |
| Q3 2022 | (7.20%) | (5.48%) | (6.82%) | (5.12%) |
| Q4 2022 | (8.33%) | (6.00%) | (8.01%) | (5.61%) |
| Q1 2023 | (8.36%) | (6.32%) | (7.74%) | (5.87%) |
| Q2 2023 | (7.68%) | (6.24%) | (7.20%) | (5.75%) |
| Q3 2023 | (6.53%) | (4.95%) | (6.23%) | (4.61%) |
| Q4 2023 | (7.42%) | (6.17%) | (7.03%) | (5.61%) |
| Q1 2024 | (7.98%) | (5.92%) | (7.49%) | (5.34%) |
| Q2 2024 | (8.42%) | (5.97%) | (7.90%) | (5.41%) |
| Q3 2024 | (8.23%) | (5.68%) | (7.72%) | (5.11%) |
| Q4 2024 | (6.41%) | (5.84%) | (6.10%) | (5.26%) |
| Q1 2025 | (3.83%) | (5.64%) | (3.61%) | (5.00%) |
| Q2 2025 | (2.46%) | (5.79%) | (1.94%) | (5.17%) |
| Q3 2025 | (3.37%) | (5.91%) | (2.35%) | (5.34%) |
| Q4 2025 | (1.54%) | (5.96%) | (0.82%) | (5.45%) |

72. Thus, by the time the Class Period began, the TRP Growth Stock Fund had failed to beat (or even match) its benchmark on both a three-year and a five-year basis for four consecutive quarters, with its five-year shortfall widening from 0.38 to 1.26 percentage points a year—violating the basic investment principle that additional active management risk must be accompanied by an expectation of additional returns. Together with the contemporaneous warning signs described below, that record required a prudent fiduciary to place the fund on watch and replace it.

73. In fact, starting Q3 of 2021 TRP Growth Stock Fund *never* outperformed its benchmark again under 3- and 5-year returns and alpha. Defendants' continuing failure to remove this fund therefore demonstrates a profound breakdown of the investment monitoring process.

74. In effect, the TRP Growth Stock Fund consistently offered a *lower* return for a *higher* degree of risk—the precise opposite of what any prudent and careful fiduciary would seek.

75. Based on the information available to Defendants with respect to TRP Growth Stock Fund performance against its index benchmark, a plan fiduciary following the minimum standard of care for prudence, when evaluating whether to continue to retain the TRP Growth Stock Fund would have determined, in light of that performance and the warning signs described below, that it violated bedrock investment principles, and would have removed it by the middle of 2020, and in any event at each of the later points described below.

76. Any prudent fiduciary exercising prudent monitoring of its menu of investment options would have noticed that the TRP Growth Stock Fund's consistent underperformance was causing catastrophic damages to the Plan participants.

77. Fiduciaries following a prudent process in monitoring this investment would have recognized this underperformance and not have ignored TRP Growth Stock Fund's shortcomings against its applicable index benchmark.

78. TRP Growth Stock Fund's violation of a bedrock investment principle—that higher risks require a higher return—would have been cause for any prudent fiduciary, together with the warning signs described below, to place the fund on watch, investigate replacements, and remove it.

79. Had Defendants engaged in appropriate monitoring, they would have placed this fund on watch before the Class Period began and removed it by the end of the second quarter of 2020.

80. Fiduciaries applying a prudent process could not sit idly by as an investment continuously failed to beat its applicable index benchmark while the warning signs described below accumulated. The TRP Growth Stock Fund was and is simply not an appropriate option for the Plan.

81. Defendants' failure to notice or act upon the TRP Growth Stock Fund's persistent underperformance relative to the benchmark the Plan itself uses for it, combined with the contemporaneous warning signs described below, supports a plausible inference that Defendants' monitoring process was deficient.

### 4. Contemporaneous Warning Signs Concerning the TRP Growth Stock Fund

82. The warning signs began before the Class Period. T. Rowe Price reported the same shortfall against the Russell 1000 Growth Index and its peer group in each of its three consecutive shareholder reports covering January 1, 2019, through June 30, 2020 (the last of them filed on August 20, 2020), each time attributing it to the fund's own stock selection. In its annual report for the year ended December 31, 2019, T. Rowe Price reported that the TRP Growth Stock Fund had trailed the S&P 500 Index and had also lagged the Russell 1000 Growth Index and its peer group, the Lipper Large-Cap Growth Funds Index. The fund returned 30.82% for 2019, against 36.39%

for the Russell 1000 Growth Index and 33.56% for the Lipper Large-Cap Growth Funds Index. In the same report, T. Rowe Price said it believed the Russell 1000 Growth Index was "the most appropriate benchmark for our fund" because the index shares the fund's style focus. T. Rowe Price identified the positions that had hurt the fund's relative performance, including its underweight position in Apple, its picks among interest-rate-sensitive financial stocks such as TD Ameritrade Holding, and its overweight position in Boeing. The same report recorded net outflows from capital share transactions of approximately $2.73 billion for 2019.[12] Its semiannual reports for the first halves of 2019 and 2020 reported the same result against both the Russell 1000 Growth Index and the peer group.[13]

83. In 2019, the last full year before the Class Period, the TRP Growth Stock Fund returned 30.82%, less than each of the five comparators described below (33.56% to 36.90%), and Morningstar placed it in the 63rd percentile of the 1,360 large-growth fund share classes it ranked, while each comparator placed between the 14th and 36th percentiles.

84. T. Rowe Price's later reports said the same thing. In its annual report for 2021, T. Rowe Price reported that the fund's 20.03% return for 2021 had underperformed the S&P 500 Index, the Russell 1000 Growth Index, which it called "style-specific," and the fund's peer group, the Lipper Large-Cap Growth Funds Index.[14] In its annual report for 2022, T. Rowe Price reported that the fund had returned -40.14%, had underperformed the S&P 500 Index, had lagged the

---

[12] T. Rowe Price Growth Stock Fund, Inc., Annual Report for the Year Ended December 31, 2019 (Form N-CSR, filed Feb. 19, 2020), https://www.sec.gov/Archives/edgar/data/80257/000120677420000516/argsf_ncsr.htm (last visited Oct. 5, 2026).

[13] T. Rowe Price Growth Stock Fund, Inc., Semiannual Report for the Six Months Ended June 30, 2019 (Form N-CSRS, filed Aug. 22, 2019), https://www.sec.gov/Archives/edgar/data/80257/000120677419002860/srgsf_ncsrs.htm; T. Rowe Price Growth Stock Fund, Inc., Semiannual Report for the Six Months Ended June 30, 2020 (Form N-CSRS, filed Aug. 20, 2020), https://www.sec.gov/Archives/edgar/data/80257/000120677420002527/srgsf_ncsrs.htm (each last visited Oct. 6, 2026).

[14] T. Rowe Price Growth Stock Fund, Inc., Annual Report for the Year Ended December 31, 2021 (Form N-CSR, filed Feb. 18, 2022), https://www.sec.gov/Archives/edgar/data/80257/000120677422000468/argsf_ncsr.htm (last visited Oct. 2, 2026).

Russell 1000 Growth Index, which returned -29.14%, and had trailed its peer group, the Lipper Large-Cap Growth Funds Index, which returned -32.03%.[15] The broad market decline of 2022 does not explain the fund's shortfall: in the same market, the TRP Growth Stock Fund lost 11 percentage points more than its own style index and more than 8 percentage points more than its peer group.

85. The investment manager of another public employer's benefits trust placed the fund on watch, and by the end of 2022, that trust no longer held it. Reporting on the quarter ended March 31, 2022, HighMark Capital Management added the I Class shares (PRUFX) of the T. Rowe Price Growth Stock Fund to the manager watch list of the County of Contra Costa's other post-employment benefits trust, which held those shares, because the fund had fallen below the median of its peer universe over three years; the fund's return for the quarter had ranked in the 90th percentile of Morningstar's U.S. large-growth universe.[16] As of March 31, 2023, the trust held no T. Rowe Price fund among its large-cap equity investments.[17]

86. On December 29, 2023, the Financial Times reported that T. Rowe Price had suffered the largest annual outflows in its history; that since early 2022, poor performance in some of its largest growth equity strategies had driven investors away; and that it was in its eleventh consecutive quarter of outflows, with more than $140 billion withdrawn from the firm since the start of 2022. T. Rowe Price's chief executive acknowledged to the newspaper that 2023 had been

---

[15] T. Rowe Price Growth Stock Fund, Inc., Annual Report for the Year Ended December 31, 2022 (Form N-CSR, filed Feb. 22, 2023), https://www.sec.gov/Archives/edgar/data/80257/000119312523044805/d402744dncsr.htm (last visited Oct. 2, 2026).

[16] HighMark Capital Management, *PARS: County of Contra Costa, First Quarter 2022*, at 8, 17 (2022), https://www.contracosta.ca.gov/DocumentCenter/View/75113/Q1-2022 (last visited Oct. 6, 2026).

[17] HighMark Capital Management, *Asset Allocation: Period Ending March 31, 2023*, *in County of Contra Costa, PARS 115 Trust - OPEB Prefunding Program Client Review and Pension Rate Stabilization Program (PRSP) Update* 18 (May 4, 2023), https://www.contracosta.ca.gov/DocumentCenter/View/79091/OPEB-Annual-Client-Review_Contra-Costa-County-2023 (archived Feb. 12, 2025, at https://web.archive.org/web/20250212130510/https://www.contracosta.ca.gov/DocumentCenter/View/79091/OPEB-Annual-Client-Review_Contra-Costa-County-2023).

a very disappointing year in some respects, particularly in the firm's outflows and the business it had lost.[18] The TRP Growth Stock Fund is one of T. Rowe Price's growth equity strategies; its assets stood at about $74 billion at the end of 2021 and about $42 billion at the end of 2022.[19]

87. In the two years after its 40 percent loss in 2022, investors redeemed, net, approximately $12.6 billion from the fund in 2023 and $8.0 billion in 2024, and in each of those years the fund's net redemptions, as a share of its assets, were larger than those of any of the five comparator funds, four of which are actively managed.

88. Investors voted with their dollars. From 2020 through 2025, investors redeemed, net, approximately $48.6 billion from the TRP Growth Stock Fund—equal to 84.5% of its assets at the end of 2019—and in five of those six years the fund's net redemptions, as a share of its assets at the start of the year, were the largest among the fund and the five comparators described below. Over the same period, the Fidelity Blue Chip Growth Fund's net flows were close to even while its assets more than doubled, and the Vanguard Russell 1000 Growth Index Fund took in approximately $17.1 billion of net new money.

89. Joseph B. Fath had managed the fund since January 2014. On December 11, 2024, T. Rowe Price announced that he would step down as its portfolio manager effective September 30, 2025, and that James Stillwagon would join him as co-portfolio manager on January 1, 2025 and then succeed him.[20]

---

[18] Madison Darbyshire, *T Rowe Price Chief Says Worst Is Over After Heaviest Ever Year for Outflows*, Fin. Times (Dec. 29, 2023), https://www.ft.com/content/7cdd7cd9-f465-48ae-af18-aa8201f8fab8 (last visited July 15, 2026).
[19] T. Rowe Price Growth Stock Fund, Inc., Annual Report for the Year Ended December 31, 2022 (Form N-CSR, filed Feb. 22, 2023), https://www.sec.gov/Archives/edgar/data/80257/000119312523044805/d402744dncsr.htm (last visited Oct. 2, 2026).
[20] T. Rowe Price Growth Stock Fund, Inc., Supplement to Prospectuses and Summary Prospectuses Dated May 1, 2024 (Form 497) (Dec. 11, 2024), https://www.sec.gov/Archives/edgar/data/80257/000174177324004587/c497.htm (last visited Oct. 7, 2026).

90. While other investors withdrew billions of dollars from the TRP Growth Stock Fund, Defendants kept it on the Plan's menu. As alleged above, as of December 31, 2025, Plan participants still had more than $446 million invested in the fund.

91. Each of these red flags was public when it appeared. Each concerned the TRP Growth Stock Fund or T. Rowe Price as a whole. Together with the fund's performance against its benchmark, the warning signs that appeared before mid-2020 required a prudent fiduciary to act then. Those that followed did not merely confirm that conclusion: each, together with the fund's widening shortfall, was an independent occasion on which a prudent fiduciary would have removed the fund, and on which Defendants failed to act.

### 5. A Prudent Fiduciary Would Have Removed the TRP Growth Stock Fund by Mid-2020, and in Any Event at Each Later Review

92. ERISA's duty to monitor is continuing. A fiduciary that fails to remove an imprudent investment at one review does not discharge its duty by retaining the investment at the next; each retention is a further breach. A prudent fiduciary reviews a plan's investment options at regular intervals, typically each quarter, and each of the dates below is a quarter-end at which such a review would have occurred.

93. By the end of the second quarter of 2020, the record before a prudent fiduciary showed that: (a) the TRP Growth Stock Fund had trailed the Russell 1000 Growth Index on both a three-year and a five-year basis in each of the four preceding quarters, by 2.57 and 1.26 percentage points a year as of June 30, 2020; (b) in 2019 its return had trailed each of the five comparators described below, and it had ranked in the 63rd percentile of its Morningstar category; and (c) T. Rowe Price had reported the fund's shortfall against its benchmark and its peer group for the first half of 2019 and for 2019 as a whole. A prudent fiduciary would have removed the fund by then.

94. Even if Defendants missed removal in mid-2020, they could not reasonably have waited past the first quarter of 2022. By December 31, 2021, the fund had trailed its benchmark on a three-year basis in ten consecutive quarters, and its three-year shortfall had reached 5.01 percentage points a year. By February 18, 2022, T. Rowe Price had reported that in 2021 the fund underperformed the Russell 1000 Growth Index and its peer group. A prudent fiduciary would have removed the fund no later than March 31, 2022.

95. Nor could a prudent fiduciary have retained the fund past the first quarter of 2023. In 2022, the fund lost 40.14%, against 29.14% for the Russell 1000 Growth Index and 32.03% for its peer group, trailing each of the five comparators and ranking in the 92nd percentile of its Morningstar category; by December 31, 2022, it trailed its benchmark by 8.33 percentage points per year over three years and 6.00 percentage points per year over five. A prudent fiduciary would have removed the fund no later than March 31, 2023. HighMark Capital Management, which had placed the fund on the watch list of the County of Contra Costa's other post-employment benefits trust for the first quarter of 2022, had by then ceased to hold it for that trust: as of March 31, 2023, that trust held no T. Rowe Price fund among its large-cap equity investments.[21]

96. In any event, a prudent fiduciary would have removed the fund no later than March 31, 2025. By then the fund trailed its benchmark over ten years as well as three and five—by 2.83 percentage points over the ten years ended June 30, 2024; in 2024 it again trailed each of the five comparators; in 2023 and 2024 its net redemptions, as a share of its assets, were the largest among the fund and the five comparators; and T. Rowe Price had announced that the portfolio manager who had run the fund since January 2014 would step down and had named his successor as co-manager, effective January 1, 2025.

[21] *See supra* ¶¶ 75, 88-89 & notes 16-18.

97. Defendants did not remove the fund at any of these points. It remained on the Plan's menu at least until December 31, 2025.

98. The losses alleged in this Complaint for the TRP Growth Stock Fund are immense in a plan that carried hundreds of millions of dollars in this investment throughout the Class Period and continue to accrue for as long as the fund remains in the Plan.

### 6. Peer Comparison, Selection, Monitoring, and Replacement Process Used by Prudent Fiduciaries

99. Defendants similarly failed to notice, or act on, the TRP Growth Stock Fund's consistent underperformance relative to its peers.

100. The standard of care for plan fiduciaries selecting and monitoring investment options under the circumstances prevailing prior to and throughout the Class Period requires an evaluation of several commonly accepted MPT metrics which serve as indicators/predictors as to whether it is reasonable to assume that any particular investment is likely to achieve its goals prospectively and is a reasonable option compared to alternatives that appear to be more likely to achieve their goals.

101. Prudent fiduciaries scrutinize investment managers to determine whether an active manager has demonstrated an ability to succeed in their chosen sector of the market. To perform this analysis, and to distinguish between a skilled manager and a lucky one, fiduciaries judge fund performance against both an appropriate index benchmark and a universe of similar funds over periods most closely approximating a market cycle—typically three- and five-year intervals. These time-horizons are emphasized by virtually all prudent fiduciaries as the most important to gauge an investment manager's ability to execute their strategy. Accordingly, these two specific time horizons (three- and five-year trailing performance) are typically weighted more heavily than any

other timeframes in connection with review of 401(k) investments. Prudent fiduciaries read them together with ten-year records where available.

102. Prudent fiduciaries utilize a careful, reasoned investment selection and monitoring process that considers a wide array of metrics commonly accepted and incorporated in MPT that allow the fiduciary to properly assess the prudence of any potential investment. Such an investment selection and monitoring process considers all the appropriate metrics and circumstances present at the time of the selection/retention/removal decision in order to evaluate whether the investment should be selected, retained, or removed.

103. This process, when properly performed, involves a regular review of MPT investment performance metrics against a relevant index and peer group for the most recent calendar quarter end over the previous three- and five-year periods in order to discern any pattern of underperformance. Through this lens, if a fund exhibits a persistent inability to exceed the returns of its market index and/or rank above a threshold percentile (the top 50% at a minimum) among its peers across a broad range of MPT metrics, prudent fiduciaries perform a detailed review of the fund and investigate potential replacements.

104. While each different fiduciary may use a slightly different set of MPT metrics weighted slightly differently, there is a set of critical metrics that are relatively more predictive of the results. In other words, regardless of the specific combination of metrics used, if an investment option rates as inferior or imprudent when evaluated by the metrics set forth below, they frequently also rate as inferior or imprudent under any reasonably prudent combination of metrics and weightings.

105. Accordingly, a prudent plan fiduciary, when determining whether to retain a “Large Growth” Investment Option, would evaluate and compare the performance and commonly

accepted investment performance metrics to meaningful benchmarks including peer alternatives/substitutes, such as the ones identified below, and the Russell 1000 Growth Index.

**7. The TRP Growth Stock Fund Has Similar Aims, Risks, and Rewards as the Comparator Funds**

106. Like other large-cap growth funds, the principal risks of the TRP Growth Stock Fund are related to: (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks.

107. The TRP Growth Stock Fund is not the only large-cap growth fund on the market with a substantially similar mix of aims, risks, and potential rewards as described above. As shown below, numerous substantially similar funds / substitutes have existed prior to and throughout the Class Period. The TRP Growth Stock Fund dramatically and consistently underperformed its benchmark and several meaningful substitutes across a wide range of commonly and prudently utilized metrics.

108. Accordingly, all the investment options described below would be included by a prudent fiduciary in the peer consideration set for both benchmarking the TRP Growth Stock Fund as well as serving as potential replacements for the TRP Growth Stock Fund in the event it needed to be replaced.

109. Moreover, prudent fiduciaries would evaluate the performance of TRP Growth Stock Fund in comparison to the alternative comparable substitute investment options and benchmarks described below.

110. As a result, the following investment strategies/investment managers[22] are and have been both meaningful benchmarks as well as potential replacements for the TRP Growth Stock

[22] Following the process utilized by prudent fiduciaries prior to and throughout the Class Period, the investment performance metric comparisons and other comparative metrics for the TRP Growth Stock Fund contained in this Complaint use the TRP Growth Stock Fund's Investor Class (PRGFX), the share class the Plan offers, and, for each

Fund prior to and throughout the Class Period. Similarly, the index listed below is and has been a meaningful benchmark to evaluate the performance of the investment managers of the TRP Growth Stock Fund prior to and throughout the Class Period:

a. Alger Focus Equity Z

b. Fidelity Blue Chip Growth K

c. JPMorgan Growth Advantage R6

d. Putnam Large Cap Growth R6

e. Vanguard Russell 1000 Growth Index I

f. Russell 1000 Growth Index

111. Each of these investable substitutes set forth above and below shares substantially similar aims, risks, potential rewards, goals, and objectives and is categorized identically by Morningstar under the following portfolio criteria: (1) Morningstar Category Broad Group ("Equity"); (2) Morningstar Category ("US Fund Large Growth"); (3) US Category Group ("U.S. Equity"); (4) Morningstar Equity Style Box (Long) ("Large Growth"); (5) Morningstar Category Index ("Russell 1000 Growth TR USD"); and (6) Morningstar Index ("Morningstar US LM Brd Growth TR USD").

112. In every calendar year from 2016 through 2025, Morningstar placed the TRP Growth Stock Fund and each of the five comparators in the large-growth square of the Morningstar Equity Style Box, and Morningstar assigns all six funds to its US Fund Large Growth category, for which it uses the Russell 1000 Growth Index as the category index.

---

comparator, a mutual fund share class appropriate for comparison in terms of fee rates, investment minimums, and track record (meaning the length of time for which the investment option has available data): Alger Focus Equity Z (ALZFX), Fidelity Blue Chip Growth K (FBGKX), JPMorgan Growth Advantage R6 (JGVVX), Putnam Large Cap Growth R6 (PGOEX), and Vanguard Russell 1000 Growth Index I (VRGWX).

113. Additionally, because the investment strategies and aims of each of the comparable benchmarks and investable substitutes set forth below are designed to focus on large growth stocks, they share similar asset allocations, as Morningstar's classifications and the funds' holdings show.

114. The funds' portfolios confirm the shared strategy.

| Fund | Giant- and Large Capitalization Allocation |
|---|---|
| TRP Growth Stock Fund | 87.1% |
| Alger Focus Equity Z | 67.5% |
| Fidelity Blue Chip Growth K | 80.3% |
| JPMorgan Growth Advantage R6 | 69.5% |
| Putnam Large Cap Growth R6 | 87.2% |
| Vanguard 1000 Growth Index I | 87.1% |

And NVIDIA, Alphabet, Apple, Microsoft, and Broadcom were among the ten largest holdings of the TRP Growth Stock Fund and of every comparator.

115. Prudent fiduciaries would have therefore included each of the comparable alternative substitute investment options when monitoring the TRP Growth Stock Fund and considered each of the investable substitutes identified above as potential replacements.

**a. Alger Focus Equity Z**

116. The Alger Focus Equity Z ("Alger Growth Fund") has similar aims, risks, and potential rewards to those of the TRP Growth Stock Fund.

117. Like the TRP Growth Stock Fund, the Alger Growth Fund is an actively managed large-cap growth fund.

118. The Alger Growth Fund's aim is to seek long-term capital appreciation. Like the TRP Growth Stock Fund, the Alger Growth Fund pursues its aim by investing primarily in stocks with growth characteristics, most of them large-cap stocks.

119. Morningstar uses the Russell 1000 Growth Index as the category index for the Large Growth category to which both the Alger Growth Fund and the TRP Growth Stock Fund belong.

120. The Alger Growth Fund's potential reward is that it will generate positive investment returns that outperform the Russell 1000 Growth Index.

121. Like the TRP Growth Stock Fund, the principal risks of the Alger Growth Fund are related to: (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks.

122. The aims, risks, and potential rewards of the Alger Growth Fund are meaningfully comparable to those of the TRP Growth Stock Fund given the similarities in the two funds' investment strategies and the types and sizes of the stocks the two funds own.

123. Under the circumstances prevailing prior to and throughout the Class Period, a prudent fiduciary or investment consultant would consider the Alger Growth Fund as a substitute for the TRP Growth Stock Fund in the event the TRP Growth Stock Fund needed to be replaced.

124. These facts make the Alger Growth Fund a meaningful comparator to the TRP Growth Stock Fund.

**b. Fidelity Blue Chip Growth K**

125. The Fidelity Blue Chip Growth K ("Fidelity Growth Fund") has similar aims, risks, and potential rewards to those of the TRP Growth Stock Fund.

126. Like the TRP Growth Stock Fund, the Fidelity Growth Fund is an actively managed large-cap growth fund.

127. The Fidelity Growth Fund's aim is to seek long-term growth of capital. Like the TRP Growth Stock Fund, the Fidelity Growth Fund pursues its aim by investing primarily in large-cap stocks with growth characteristics.

128. Morningstar uses the Russell 1000 Growth Index as the category index for the Large Growth category to which both the Fidelity Growth Fund and the TRP Growth Stock Fund belong.

129. The Fidelity Growth Fund's potential reward is that it will generate positive investment returns that outperform the Russell 1000 Growth Index.

130. Like the TRP Growth Stock Fund, the principal risks of the Fidelity Growth Fund are related to: (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks.

131. The aims, risks, and potential rewards of the Fidelity Growth Fund are meaningfully comparable to those of the TRP Growth Stock Fund given the similarities in the two funds' investment strategies and the types and sizes of the stocks the two funds own.

132. Under the circumstances prevailing prior to and throughout the Class Period, a prudent fiduciary or investment consultant would consider the Fidelity Growth Fund as a substitute for the TRP Growth Stock Fund in the event the TRP Growth Stock Fund needed to be replaced.

133. These facts make the Fidelity Growth Fund a meaningful comparator to the TRP Growth Stock Fund.

**c. JPMorgan Growth Advantage R6**

134. The JPMorgan Growth Advantage R6 ("JPM Advantage Growth Fund") has similar aims, risks, and potential rewards to those of the TRP Growth Stock Fund.

135. Like the TRP Growth Stock Fund, the JPM Advantage Growth Fund is an actively managed large-cap growth fund.

136. The JPM Advantage Growth Fund's aim is to seek long-term growth of capital. Like the TRP Growth Stock Fund, the JPM Advantage Growth Fund pursues its aim by investing primarily in stocks with growth characteristics, most of them large-cap stocks.

137. Morningstar uses the Russell 1000 Growth Index as the category index for the Large Growth category to which both the JPM Advantage Growth Fund and the TRP Growth Stock Fund belong.

138. The JPM Advantage Growth Fund's potential reward is that it will generate positive investment returns that outperform the Russell 1000 Growth Index.

139. Like the TRP Growth Stock Fund, the principal risks of the JPM Advantage Growth Fund are related to: (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks.

140. The aims, risks, and potential rewards of the JPM Advantage Growth Fund are meaningfully comparable to those of the TRP Growth Stock Fund given the similarities in the two funds' investment strategies and the types and sizes of the stocks the two funds own.

141. Under the circumstances prevailing prior to and throughout the Class Period, a prudent fiduciary or investment consultant would consider the JPM Advantage Growth Fund as a substitute for the TRP Growth Stock Fund in the event the TRP Growth Stock Fund needed to be replaced.

142. These facts make the JPM Advantage Growth Fund a meaningful comparator to the TRP Growth Stock Fund.

**d. Putnam Large Cap Growth R6**

143. The Putnam Large Cap Growth R6 ("Putnam Growth Fund") has similar aims, risks, and potential rewards to those of the TRP Growth Stock Fund.

144. Like the TRP Growth Stock Fund, the Putnam Growth Fund is an actively managed large-cap growth fund.

145. The Putnam Growth Fund's aim is to seek capital appreciation. Like the TRP Growth Stock Fund, the Putnam Growth Fund pursues its aim by investing primarily in large-cap stocks with growth characteristics.

146. Morningstar uses the Russell 1000 Growth Index as the category index for the Large Growth category to which both the Putnam Growth Fund and the TRP Growth Stock Fund belong.

147. The Putnam Growth Fund's potential reward is that it will generate positive investment returns that outperform the Russell 1000 Growth Index.

148. Like the TRP Growth Stock Fund, the principal risks of the Putnam Growth Fund are related to: (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks.

149. The aims, risks, and potential rewards of the Putnam Growth Fund are meaningfully comparable to those of the TRP Growth Stock Fund given the similarities in the two funds' investment strategies and the types and sizes of the stocks the two funds own.

150. Under the circumstances prevailing prior to and throughout the Class Period, a prudent fiduciary or investment consultant would consider the Putnam Growth Fund as a substitute for the TRP Growth Stock Fund in the event the TRP Growth Stock Fund needed to be replaced.

151. These facts make the Putnam Growth Fund a meaningful comparator to the TRP Growth Stock Fund.

**e. Vanguard Russell 1000 Growth Index I**

152. The Vanguard Russell 1000 Growth Index I ("Vanguard Growth Fund") is a passively managed index fund that seeks to track the performance of the Russell 1000 Growth Index. The Vanguard Growth Fund tracks the Russell 1000 Growth Index by investing its assets in the large-cap growth stocks that make up the Russell 1000 Growth Index.

153. The Vanguard Growth Fund has similar aims, risks, and potential rewards as the TRP Growth Stock Fund because it tracks TRP Growth Stock Fund's index benchmark.

154. The Vanguard Growth Fund's potential reward is that it will generate investment returns in line with the Russell 1000 Growth Index.

155. Like the TRP Growth Stock Fund, the principal risks of the Vanguard Growth Fund are related to: (1) market risk, (2) issuer risk, and (3) the risks of investing in growth-oriented stocks.

156. The aims, risks, and potential rewards of the Vanguard Growth Fund are meaningfully comparable to those of the TRP Growth Stock Fund given the similarities in the two funds' aims, investment strategies, and the types and sizes of the stocks the two funds own.

157. As described above, under MPT and CAPM incorporated into the standard of care and circumstances prevailing prior to and throughout the Class Period, the Vanguard Growth Fund represents an investable benchmark that is required to be compared with actively managed large cap growth investment options to evaluate whether it is rational to select or retain a particular actively managed large cap growth investment option.

158. These facts make the Vanguard Growth Fund a meaningful comparator to the TRP Growth Stock Fund.

**f. Russell 1000 Growth Index**

159. As noted above, TRP discloses to the investing public that the Russell 1000 Growth Index is an investment performance benchmark for the TRP Growth Stock Fund and that the Russell 1000 Growth Index is an index that closely aligns with the fund's investment strategy.

160. That means that TRP and the investment manager of the TRP Growth Stock Fund have both necessarily concluded that the TRP Growth Stock Fund and the Russell 1000 Growth Index share similar investment characteristics and, in fact, T. Rowe Price's annual shareholder report for the year ended December 31, 2025, compares the performance of the TRP Growth Stock

Fund to that of the Russell 1000 Growth Index and thus as a matter of fact is a meaningful benchmark to TRP Growth Stock Fund.

161. The Russell 1000 Growth Index measures the performance of the large-cap growth segment of the U.S. stock market. It includes companies that are similar to the companies included in the TRP Growth Stock Fund.

162. Investors can own the Russell 1000 Growth Index by investing in investment options that own all or substantially all the stocks represented in the Russell 1000 Growth Index such as the Vanguard Russell 1000 Growth Index Fund discussed above.

163. By virtue of the similarities in their investment strategies, respective market capitalizations, and risk profiles, the Russell 1000 Growth Index and the TRP Growth Stock Fund share similar aims, rewards, and levels of risk.

164. These facts make the Russell 1000 Growth Index a meaningful comparator in the context of evaluating the prudence of TRP Growth Stock Fund under the circumstances prevailing prior to and throughout the Class Period.

**8. The TRP Growth Stock Fund Underperformed the Peer Comparators**

165. Poor investment performance can seriously diminish a participant's retirement savings. An investment option that underperforms by half a percent annually has a material impact on a participant's retirement savings, particularly over the course of a multi-decade working career.

166. Under the circumstances prevailing prior to and throughout the Class Period fiduciaries following a prudent process selecting and monitoring large growth investment options made available to defined contribution plan participants would have evaluated the following commonly accepted MPT investment metrics which clearly demonstrated the TRP Growth Stock Fund should have been removed and replaced by the middle of 2020.

167. The TRP Growth Stock Fund's severe and consistent underperformance, illustrated in the tables below, raises a plausible inference that the TRP Growth Stock Fund could not have been determined to be prudent by any reasonably attentive fiduciaries during the Class Period.

168. Moreover, the TRP Growth Stock Fund's severe underperformance illustrated in the tables below raises a plausible inference that the TRP Growth Stock Fund could not have been expected to provide reasonable investment returns given the risk and therefore was not a prudent investment prior to and throughout the Class Period.

169. The following table illustrates the severe and consistent underperformance of the TRP Growth Stock Fund compared to meaningful comparable benchmarks and alternative options identified above based on widely used and commonly accepted MPT investment performance metrics.

170. Specifically, the table below provides a summary of 3- and 5-year investment returns and MPT investment manager performance metrics compared to the meaningful comparable investable alternatives/substitutes identified above throughout 2018 and 2019. Specifically, at year-end 2018 and 2019, the TRP Growth Stock Fund had underperformed 84% of a set of significant MPT investment manager metrics over 3- and 5-year periods.

**Performance Metrics Comparison Summary January 2018 - December 2019**

| Metric Analyzed | Total # of Metrics Analyzed Against Comparators | # of Metrics Underperformed | Percentage of Metrics Underperformed |
|---|---|---|---|
| 3 - Year Return | 10 | 10 | 100% |
| 5 - Year Return | 10 | 10 | 100% |
| Sharpe Ratio - 3 - Year | 10 | 9 | 90% |
| Sharpe Ratio - 5 - Year | 10 | 9 | 90% |
| Information Ratio 3 - Year | 8 | 8 | 100% |
| Information Ratio 5 - Year | 8 | 8 | 100% |
| Alpha 3 - Year | 8 | 7 | 88% |
| Alpha 5 - Year | 8 | 7 | 88% |
| Sortino Ratio - 3 - Year | 10 | 8 | 80% |
| Sortino Ratio - 5 - Year | 10 | 7 | 70% |
| Batting Average 3 - Year | 8 | 5 | 63% |
| Batting Average 5 - Year | 8 | 3 | 38% |
| **Total** | **108** | **91** | **84%** |

171. The table below shows the continued underperformance of the MPT investment metrics of the TRP Growth Stock Fund compared to the meaningful comparators identified above from 2020 through 2025.

**Performance Metrics Comparison Summary January 2020 - December 2025**

| Metric Analyzed | Total # of Metrics Analyzed Against Comparators | # of Metrics Underperformed | Percentage of Metrics Underperformed |
|---|---|---|---|
| 3 - Year Return | 30 | 29 | 97% |
| 5 - Year Return | 30 | 30 | 100% |
| Sharpe Ratio - 3 - Year | 30 | 29 | 97% |
| Sharpe Ratio - 5 - Year | 30 | 30 | 100% |
| Information Ratio 3 - Year | 24 | 23 | 96% |
| Information Ratio 5 - Year | 24 | 24 | 100% |
| Alpha 3 - Year | 24 | 23 | 96% |
| Alpha 5 - Year | 24 | 24 | 100% |
| Sortino Ratio - 3 - Year | 30 | 28 | 93% |
| Sortino Ratio - 5 - Year | 30 | 30 | 100% |
| Batting Average 3 - Year | 24 | 21 | 88% |
| Batting Average 5 - Year | 24 | 24 | 100% |
| **Total** | **324** | **315** | **97%** |

172. The table below shows the severe underperformance in terms of the returns of the TRP Growth Stock Fund from January 1, 2020 through December 31, 2025 compared to prudent alternatives and meaningful comparable benchmarks which approximately represents the losses suffered by plan participants as a direct result of the Plan fiduciaries' imprudent retention of the TRP Growth Stock Fund throughout the Class Period.

**Approximate Performance Losses and Metrics January 1, 2020 to December 31, 2025**

| Investment Name | Total # of Metrics Analyzed | # of Metrics Underperformed | Percentage of Metrics Underperformed | Performance Losses ($) vs. Comparators |
|---|---|---|---|---|
| Alger Focus Equity Z | 72 | 71 | 99% | -$152,938,718 |
| Fidelity Blue Chip Growth K | 72 | 72 | 100% | -$121,855,649 |
| JPMorgan Growth Advantage R6 | 72 | 66 | 92% | -$79,019,639 |
| Putnam Large Cap Growth R6 | 72 | 70 | 97% | -$57,703,551 |
| Vanguard Russell 1000 Growth Index I | 36 | 36 | 100% | -$76,833,484 |
| **T. Rowe Price Growth Stock Aggregate Summary** | **324** | **315** | **97%** | |

173. In summary, Defendants retained the TRP Growth Stock Fund prior to and throughout the Class Period despite readily available information (available both prior to and

throughout the Class Period) which indicated dramatically inferior investment returns as well as dramatically inferior performance on MPT investment manager and risk adjusted metrics.

174. In other words, examining the information available to Defendants in 2020, a plan fiduciary following the minimum standard of care for prudence, when evaluating whether to continue to retain the TRP Growth Stock Fund would have determined that its investment performance was inferior and its risk-adjusted performance was severely inferior under commonly accepted MPT investment metrics and thus removed the TRP Growth Stock Fund by the middle of 2020.

175. As a direct result of this conduct, the Plan participants have suffered investment losses of, at a minimum, tens of millions of dollars.

176. A prudent fiduciary would have in place a process of investigating and monitoring all plan funds, relative to their comparators and benchmarks, over a 3-year and 5-year period. A prudent fiduciary would put in place, and regularly carry out, a process in which consistently underperforming funds were removed from the list of investment options and replaced with prudent alternative/substitutes.

177. A prudent fiduciary monitors each actively managed investment option against the index benchmark the managers use for it. Here, T. Rowe Price uses the Russell 1000 Growth Index as the TRP Growth Stock Fund’s benchmark and publicly reported the fund’s shortfall against that index over one, five, and ten years. The comparison that shows the fund’s sustained failure was therefore before Defendants, yet the fund was not removed.

178. Any prudent fiduciary exercising reasonable and careful stewardship over the Plan, and its menu of investment options, would have noticed that the TRP Growth Stock Fund’s consistent underperformance was causing catastrophic damages to the plan participants.

179. The fund's shortfall was apparent and the warning signs described above were public. Whether Defendants failed to review that information or reviewed it and failed to act on it, the fund's continued retention reflects an unreasonable and imprudent process and constitutes a breach of fiduciary duty that caused real and ongoing harm to Plaintiff and the other Plan participants.

180. In summary, Defendants' failure to have in place adequate processes to promptly remove and replace the TRP Growth Stock Fund from the Plan's investment menu caused the plan participants tens of millions of dollars in lost earnings over the Class Period.

## CLASS ACTION ALLEGATIONS

181. 29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

182. In acting in his representative capacity for the Plan, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representative of, the following 401(k) Class:

> All participants and beneficiaries of the M&T Bank Inc. 401(k) Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning October 26, 2020, and running through the date of judgment.

183. The 401(k) Class includes thousands of members, approximately 30,000 participants with account balances as of December 31, 2025,[23] and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

184. There are questions of law and fact common to this 401(k) Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took

[23] *See* M&T Bank Corporation Retirement Savings Plan, Form 5500 Annual Report for 2025.

the actions and omissions alleged as to the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

a. Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

b. Whether Defendants breached their fiduciary duties to the Plan by failing to put in place, and carry out, a reasonable and prudent process for reviewing investment options within the Plan;

c. What are the losses to the Plan resulting from each breach of fiduciary duty; and

d. What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of fiduciary duty.

185. Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiff was a participant during the time period at issue and all similarly situated participants in the Plan were harmed by Defendants' misconduct.

186. Plaintiff will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because Plaintiff was a participant in the Plan during the Class Period, has no interest that conflicts with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent lawyers to represent the Class.

187. Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants concerning their discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and

beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

188. Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

189. Plaintiff's counsel has substantial and varied experience in complex ERISA and class action litigation and will adequately represent the Class.

190. The claims brought by the Plaintiff arise from fiduciary breaches as to the Plan in its entirety and do not involve mismanagement of individual accounts.

191. The claims asserted on behalf of the Plan in this case fall outside the scope of any exhaustion language in the individual participants' Plan.

192. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

193. Under ERISA, an individual "participant" or "beneficiary" is distinct from an ERISA Plan. A participant's obligation—such as a requirement to exhaust administrative remedies—does not, by itself, bind the Plan.

194. Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances—that the Court should review and where appropriate defer to a Plan administrator's decision—does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

## FIRST CLAIM FOR RELIEF

**Breach of Duty of Prudence**
**Against the Committee**

195. Plaintiff restates the foregoing paragraphs as if fully set forth herein.

196. At all relevant times, the Committee and all individual Committee members acted as fiduciaries within the meaning of 29 U.S.C. § 1002(21)(A). Each of these Defendants (i) exercised authority and control with respect to the management of the Plan and its assets, and (ii) had discretionary authority or discretionary responsibility in the administration of the Plan.

197. Pursuant to 29 U.S.C. § 1104(a)(1), the Committee and its individual members were required to discharge their duties to the Plan "solely in the interest of the participants and beneficiaries" and to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

198. The Committee and its individual members are and were responsible for investigating, evaluating, and monitoring the Plan's investment options on an ongoing basis, eliminating imprudent investments, and taking all necessary steps to ensure that plan assets were invested prudently.

199. The Committee and its individual members breached their fiduciary duties through an imprudent process for investigating, evaluating, and monitoring the Plan's investment options.

200. A reasonably prudent fiduciary, following a reasonably prudent process, would have removed and not retained the T. Rowe Price Growth Stock Fund from the Plan's set of investment options.

201. By failing to timely remove the T. Rowe Price Growth Stock Fund from the Plan's set of investment options, and replacing it with one of the several available comparator funds, the

Committee and its individual members therefore failed to discharge their duties with the care, skill, diligence and prudence required by ERISA.

202. These breaches have caused substantial damage to the Plan, for which the Committee and its individual members are jointly and severally liable.

203. The Committee and its individual members knowingly participated in the breach of the other, knowing that such acts were a breach, enabled other fiduciaries to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

## SECOND CLAIM FOR RELIEF

### Failure to Adequately Monitor Other Fiduciaries
### Against Trust Company and or M&T Bank

204. Plaintiff restates the foregoing paragraphs as if fully set forth herein.

205. Defendants Trust Company and or M&T Bank had the authority to appoint and, upon information and belief, to remove members or individuals of the Committee and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

206. Trust Company and or M&T Bank had a duty to monitor those individuals to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the fiduciaries were not fulfilling their duties.

207. Trust Company and or M&T Bank further had a duty to ensure that the Plan fiduciaries possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their

decisions and analysis; and reported regularly to Trust Company and or M&T Bank as Plan sponsor.

208. The objectively imprudent manner in which the Committee failed to timely act to remove the T. Rowe Price Growth Stock Fund inferentially establishes that Trust Company and or M&T Bank breached its duty to monitor by failing to monitor and evaluate the performance of Plan fiduciaries or have a system in place for doing so; failing to monitor the process by which the Committee evaluated, selected, and monitored plan investment options; and failing to remove individuals whose performance was inadequate in their fiduciary duties on the Committee.

209. As a consequence of these breaches of the duty to monitor, Plaintiff and other Plan participants suffered tens of millions of dollars of objectively unreasonable and unnecessary monetary losses.

210. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Trust Company and or M&T Bank is liable to restore to the Plan all losses caused by its failure to adequately monitor individuals on the Committee responsible for the failure to timely remove the TRP Growth Stock Fund, as well as equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B. Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C. A Declaration the Defendants have breached their fiduciary duties under ERISA;

D. An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, and restoring to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

E. An Order requiring M&T Bank and Trust Company to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against M&T Bank and Trust Company as necessary to effectuate relief, and to prevent M&T Bank's and Trust Company's unjust enrichment;

F. An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G. Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary/consultant or fiduciaries to run the Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties;

H. An award of pre-judgment and post-judgment interest;

I. An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J. Such other and further relief as the Court deems equitable and just.

Respectfully submitted,

Date: October 26, 2026

*/s/James E. Cecchi*

James E. Cecchi
Kevin G. Cooper
**CARELLA BYRNE CECCHI**
**BRODY & AGNELLO, P.C.**
5 Becker Farm Rd.
Roseland, NJ 07068
973-994-1700
jcecchi@carellabyrne.com
kcooper@carellabyrne.com

**MILBERG, PLLC**
Alexandr Rudenco*
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Tel: (865) 247-0080
arudenco@milberg.com

* *Pro Hac Vice* Application Forthcoming
*Attorneys for Plaintiff and Proposed Class*